UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| THE STATE OF LOUISIANA,<br><br>PLAINTIFF,<br><br>v.<br><br>ALEJANDRO MAYORKAS, Secretary of the U.S. Department of Homeland Security, in his official capacity; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; PATRICK J. LECHLEITNER, in his official capacity as Deputy Director and senior official performing the duties of the Director; RICHWOOD CORRECTIONAL CENTER; LASALLE CORRECTIONS; SOUTH LOUISIANA ICE PROCESSING FACILITY; THE GEO GROUP, INC.; U.S. CENTERS FOR DISEASE CONTROL AND PREVENTION (CDC); MANDY K. COHEN, Director of CDC, in her official capacity; NATIONAL CENTER FOR HIV, VIRAL HEPATITIS, STD, AND TB PREVENTION (NCHHSTP); JONATHAN MERMIN, Director of NCHHSTP, in his official capacity.<br><br>DEFENDANTS. | CIVIL ACTION NO. _____ |

## COMPLAINT

1. This case presents an emergency situation for the State of Louisiana. Following ▇ illegal entry into the United States, a Chinese national named ▇▇▇▇▇▇ has been transported by U.S. Immigration and Customs Enforcement (ICE) throughout facilities in Louisiana—from Monroe down to Basile and Lafayette—coming in contact with over 200 detainees and untold numbers of non-detainees.

2. ▇▇▇ has a rare, aggressive, and drug-resistant form of tuberculosis, which carries high mortality rates.

1

3. The State of Louisiana, through its Department of Health and Surgeon General, has taken immediate steps to isolate ▓ and to stop the potential spread of the disease. That includes orders from the Surgeon General spanning the past holiday weekend and ordering the two detention facilities that held ▓ not to release any detainees unless and until they have been medically cleared by the Louisiana Department of Health.

4. The reason for this emergency lawsuit is narrow but critical: ICE has announced its intent to release potentially infected detainees from its two contract facilities—*without* being medically cleared by the Louisiana Department of Health—if an order requires release. Specifically, in the event that (for example) an Article I immigration judge orders a detainee's release, ICE's stated intent is to release that detainee onto Louisiana streets, its bus stations, and its airports. By ICE's telling, its hands are tied once its immigration-based detention authority runs out.

5. This is utterly wrong. The Surgeon General's standing orders require detainees at the two facilities in question to be held unless and until they are medically cleared by the Louisiana Department of Health. That is a quintessential exercise of the State's sovereign prerogatives, the exercise of its police powers, and its obligation to protect the public health within its borders. No law exempts these two facilities—which ICE does not own—from complying with the Surgeon General's orders. To proceed otherwise, as ICE has confirmed it intends to do, would be contrary to wide swaths of federal regulations; blatantly arbitrary and capricious; and a direct violation of the Tenth Amendment and Louisiana's sovereign authority.

6. This emergency lawsuit thus asks for only two narrow forms of relief:

An immediate temporary restraining order, and then a preliminary and a permanent injunction, preventing ICE and its contract facilities from releasing any detainee unless and until the Louisiana Department of Health has medically cleared that detainee.

If the Court deems it necessary, an order to CDC to immediately show cause why it should not issue an order pursuant to Title 42 of the U.S. Code, requiring the isolation and/or quarantine of detainees at the two contract facilities unless and until they are medically cleared by the Louisiana Department of Health.

7.      Because time is of the essence, the State is contemporaneously filing a temporary restraining order application. The Solicitor General, along with the Attorney General, the Surgeon General, and other Department of Health staff, is immediately available to the Court for a conference to answer any questions the Court may have.

### PARTIES

8.      Plaintiff State of Louisiana is a sovereign state of the United States of America. Liz Murrill is the Attorney General of Louisiana. She is authorized by Louisiana law to sue on the State's behalf. La. Const. art. IV, § 8. Her office is located at 1885 N. Third St., Baton Rouge, Louisiana 70802.

9.      Defendant Alejandro Mayorkas is sued in his official capacity as the Secretary of the U.S. Department of Homeland Security.

10.      Defendant U.S. Department of Homeland Security is a federal executive agency responsible for enforcing federal laws governing, as relevant here, border control and immigration.

11.      Defendant U.S. Immigration and Customs Enforcement (ICE) is a component of DHS and is responsible for, among other things, detaining noncitizens who are in civil immigration proceedings and pending removal from the United States.

12.      Defendant Patrick J. Lechleitner is sued in his official capacity as the Deputy Director and Senior Official Performing the Duties of the Director of ICE.

13.      Defendant Richwood Correctional Center is private detention facility located at 180 Pine Bayou Circle, Monroe, LA 71202.

14.      Defendant LaSalle Corrections is a private company that operates and/or manages Richwood Correctional Center pursuant to a contract with ICE.

15.      Defendant South Louisiana ICE Processing Center (also known as the "Basile ICE facility") is a private detention facility located at 3843 Stagg Avenue, Basile, Louisiana 70515.

16. Defendant The GEO Group, Inc. is a publicly traded corporation located at 4955 Technology Way, Boca Raton, Florida 33431. It specializes in the ownership, leasing, and management of correctional facilities. The GEO Group, Inc. operates and/or manages the Basile ICE facility pursuant to a contract with ICE.

17. Defendant U.S. Centers for Disease Control and Prevention (CDC) is a federal executive agency responsible for protecting the public health.

18. Defendant Mandy K. Cohen is Director of CDC and is sued in her official capacity.

19. Defendant National Center for HIV, Viral Hepatitis, STD, and TB Prevention (NCHHSTP) is a component of CDC responsible for combatting "the nation's most prevalent infectious diseases," including tuberculosis.

20. Defendant Jonathan Mermin is Director of NCHHSTP and is sued in his official capacity.

## JURISDICTION AND VENUE

21. This Court has subject-matter jurisdiction over this case because it arises under the laws of the United States. *See* 28 U.S.C. §§ 1331, 1346, 1361; 5 U.S.C. §§ 701-06. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief under 28 U.S.C. §§ 2201-02, 5 U.S.C. §§ 705-06, and its inherent equitable powers.

22. The United States' sovereign immunity is waived under 5 U.S.C. §§ 702, 706.

23. Venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(C) because the State of Louisiana is a resident of this judicial district (and no real property is involved) and 28 U.S.C. § 1391(e)(1)(B) because a substantial part of the events or omissions giving rise to the State's claims occurred in this district.

## BACKGROUND

24. The following allegations are taken almost directly from the declarations of Surgeon General Ralph Abraham and Attorney General Liz Murrill submitted in connection with the temporary restraining order application that the State will file contemporaneously with this Complaint.

### I. Overview of Tuberculosis

25. The emergency precipitating this lawsuit involves mycobacterium tuberculosis (TB). TB is a pathogenic bacteria that infects the lungs. It is highly aerobic—it likes and needs oxygen to survive.

26. TB germs can get into the air when a person with active TB disease of the lungs or throat coughs, speaks, or sings. These germs can stay in the air for several hours, depending on the environment.

27. Infection is slow growing and may not be detected until 8-10 weeks after exposure. TB is difficult to detect in its early stages before the patient becomes symptomatic. Common signs and symptoms of active TB include a persistent cough, coughing up blood, night sweats, weight loss, and fever.

28. Relevant here is "drug-resistant TB"—that is, TB bacteria that are resistant to at least one of the most effective TB medicines used in treatment regimens. Drug-resistant TB is transmitted in the same way as drug-susceptible TB, but delays in recognition of the drug resistance (and delays in access to effective anti-TB drugs) may increase transmission and further development of drug resistance.

29. *Multi*-drug resistant TB (MDR TB) goes one step further because it is TB bacteria that are resistant to at least isoniazid and rifampin, the most effective first-line TB treatment drugs. One type of MDR TB is "pre-extensively drug-resistant TB (pre-XDR TB)," which is TB bacteria that is

resistant to (a) isoniazid, rifampin, and a fluoroquinolone *or* (b) isoniazid, rifampin, and a second-line injectable (amikacin, capreomycin, and kanamycin).

30. In plain English, pre-XDR TB is extremely serious—and far more so than ordinary TB. It is highly resistant to both first- and second-line anti-TB medications, difficult to treat, and has a high mortality rate. Studies say that the mortality rate is anywhere from 34-39%. It thus represents an imminent threat to public health wherever it appears.

**II. ICE Transports a Detainee with Pre-XDR TB Throughout Louisiana.**

31. In April 2024, a ▇▇▇ named ▇▇▇ in ▇▇▇ left ▇▇▇. Following a stop in ▇▇▇, ▇ arrived in ▇▇▇ and then crossed the United States-Mexico border. Federal authorities apprehended ▇ in California on July ▇, 2024.

32. On July ▇, 2024, ICE flew ▇ on a plane with over 100 detainees from ▇▇▇, ▇▇▇, to Alexandria, Louisiana. In Alexandria, ▇ boarded a bus with approximately 40 detainees, and ICE took ▇ to the Richwood Correction Center in Monroe. Richwood is operated and/or managed by LaSalle Corrections on contract with ICE. ▇ was not in isolation between July ▇ and July ▇.

33. At least some of the approximately 40 detainees that arrived at Richwood with ▇ have since been deported, transferred, relocated, or released.

34. Upon her July ▇ arrival at Richwood, ▇ had a purified protein derivative (PPD)—a TB skin test—placed. The PPD was read three days later on July 23 and was noted to be highly positive.

35. On July 23, ▇ was transferred to ▇▇▇, where she received a chest x-ray that was noted to be suspicious for active TB. Respiratory precautions were instituted. The same day, ▇ was transferred to ▇▇▇ for further testing. She was returned to Richwood on July ▇ under

6

airborne precautions ordered by the receiving physician who still suspected TB notwithstanding the patient's work-up at ▇.

36. Three days later—on July ▇—ICE moved ▇ to the South Louisiana ICE Processing Center ("the Basile facility") in Basile, Louisiana. Like Richwood, the Basile facility is operated and/or managed by The GEO Group, Inc., on contract with ICE.

37. On August ▇ ▇ was released into general population at the Basile facility—and was not in any form of airborne isolation between August ▇ and September ▇. There were approximately 174 detainees at the Basile facility that were potentially exposed to ▇, approximately 60 of which have been deported, transferred, relocated, or released from the Basile facility.

38. On September ▇ the Basile facility collected sputums (saliva and mucus coughed up) from ▇ and tested them for TB. Those results later came back positive.

39. On September ▇ and ▇ the facility collected two sputums, which the Louisiana Department of Health's Office of Public Health then couriered to the State public health lab. ▇ was also hospitalized and contained (airborne isolation) at ▇, Louisiana, for active TB.

40. On October 9, the Louisiana Department of Health received test results confirming that ▇ has pre-XDR TB.

**III. Louisiana Department of Health Immediately Seeks to Stop the Spread of Disease.**

41. The news of ▇ test results triggered immediate action throughout numerous State agencies and the Governor's office as the State has attempted to determine the full scope of the emergency and to stop any further spread of the disease.

42. The State's current emergency-response roadmap involves three Phases: Phase 1 (identifying contacts and contact tracing); Phase 2 (screening, follow-up testing, and medical evaluation); and Phase 3 (treatment and follow-up).

43. As the State's designated State Health Officer, Surgeon General Ralph Abraham is leading this charge. Under Louisiana law, he has the express authority "[t]o isolate and quarantine for the care and control of communicable disease within the state" and "[t]o take such action as is necessary to accomplish the subsidence and suppression of diseases of all kinds in order to prevent their spread." La. R.S. 40:5(A)(1), (2). He also has the express authority to "enforce a sanitary code for the entire state containing provisions for the improvement and amelioration of the hygienic and sanitary conditions of the state." *Id.* 40:5(A)(3).

44. The Surgeon General has exercised that authority in multiple respects relevant here.

45. On October 10, he issued a letter to ICE requesting that ICE take numerous actions, including that ICE "[f]irst and foremost[] halt all movement of exposed detainees until they are cleared by our LDH Disease Intervention Specialists after being appropriately screened."

46. On October 11, the Surgeon General issued the first of three State Health Officer (SHO) Emergency Orders. (Each SHO Order walks extensively through the Surgeon General's legal authorities.) This Order is directed at ▓▓ ▓▓ and ▓▓▓▓▓▓▓ were ▓ is currently located. The Order directs ▓ to remain at the Hospital while the Order remains in effect, and orders the Hospital to detain ▓ and restrict ▓ to isolation protocols. The Order concludes by noting that a violation of the Order is punishable by fine or imprisonment.

47. On October 12, the Surgeon General issued a second SHO Order—this time directed at ICE and the Basile facility. It orders that "[h]igh risk contacts as identified by the LDH/OPH in coordination with the Basile ICE facility medical staff must be cohorted and held at the facility until cleared by LDH/OPH," and that "[a]ll other detainees, including new intakes, must remain separated from that cohort until the contact investigation is complete as determined by LDH/OPH." This Order, too, emphasizes that a violation of the Order is punishable by fine or imprisonment.

48. On October 14, the Surgeon General issued a third SHO Order—this time directed at ICE and the Richwood facility. As with the Basile SHO Order, this Order commands that "[h]igh risk contacts as identified by the LDH/OPH in coordination with the Richwood ICE facility medical staff must be cohorted and held at the facility until cleared by LDH/OPH," and that "[a]ll other detainees, including new intakes, must remain separated from that cohort until the contact investigation is complete as determined by LDH/OPH." It, too, notes the penalties for a violation.

### IV. ICE Announces Intent to Release Potentially Infected Detainees Without Medical Clearance, If So Ordered by the Executive Branch.

49. As the Surgeon General's SHO Orders demonstrate, the efficacy of the State-wide fight against the spread of ▉▉▉ aggressive form of tuberculosis depends entirely on stopping new potential transmissions. For that reason, the Surgeon General and the Attorney General have repeatedly demanded from ICE an assurance that no detainee will be released from the Richwood and Basile facilities without first being medically cleared by the Louisiana Department of Health.

50. Remarkably, ICE has taken the opposite position.

51. On an October 15 call between the Attorney General, the Solicitor General, the Surgeon General, and various federal authorities, ICE representatives unequivocally stated that, if there is an order to release a detainee from one of these facilities, they will comply with that order notwithstanding the Surgeon General's own standing quarantine and isolation orders—and that they would do so with only a few hours' notice to the State.

52. In a follow-up email the same day, ICE confirmed its view:

> I can confirm that both Richwood and Basile are currently not intaking any new detainees. If we encounter a situation involving a detainee that we are legally required to release, we will contact LDH and provide time to take appropriate action and coordinate any transfer of custody to LDH as needed.

53. In other words, the federal government's position is that it (through its private contract facilities) will not comply with the Surgeon General's SHO Orders. Put otherwise, although the federal

9

government brought pre-XDR TB to Louisiana and botched its handling of ▮ thereby subjecting potentially hundreds of people to exposure, the federal government believes it should be permitted to release potentially infected detainees—without the Louisiana Department of Health's medical clearance—into Louisiana streets, bus stations, and airports.

54. In the federal government's view, it can wash its hands of a public disaster of its own making and then force Louisiana to either (a) let a potentially infected detainee run free in Louisiana or (b) attempt to redetain the detainee and figure out housing, isolation, and other measures all while trying to solve the State-wide problem that the federal government created.

## CLAIMS FOR RELIEF

### COUNT I (All Defendants)
### Violation of APA, 5 U.S.C. § 706(2)(B)
### Tenth Amendment, State Police Powers

55. The State repeats and incorporates by reference each of the Complaint's allegations stated above.

56. ICE's stated intent to release detainees contrary to the Surgeon General's SHO Orders is final agency action within the meaning of 5 U.S.C. § 704.

57. The State has no other adequate remedy to challenge ICE's stated intent in court; that is, ICE has made clear that its contract facilities will not comply with the Surgeon General's SHO Orders if any other order (like an Article I judge's asylum order) requires a detainee's release. Indeed, even if the State sought statutory relief in state court against ICE and the facilities to effectuate the Surgeon General's SHO Orders, *see* La. R.S. 40:6, the upshot of ICE's position is that any contrary release order from a federal authority would supersede that relief. *See also Leal v. Azar*, 489 F. Supp. 593, 600 (N.D. Tex. 2020), *vacated in part, appeal dismissed in part sub nom. Leal v. Becerra*, No. 20-11083, 2021 WL 5021034 (5th Cir. June 3, 2021) (stating that "a state court within the Fifth Circuit has no injunctive power over federal officers"). As a result, the State has no adequate remedy at law.

58. The APA requires courts to set aside unlawful agency action that is "contrary to constitutional right [or] power." 5 U.S.C. § 706(2)(B).

59. The Tenth Amendment specifies that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States, respectively, or to the people." U.S. Const. amend. X.

60. Among those powers reserved to the States are their historic and traditional police powers. Indeed, "[i]n view of the historic importance of federalism in these areas, the states' police powers relating to public health and safety are not preempted by federal law unless Congress' intent to do so is clearly expressed." *Gomez v. St. Judge Med. Daig Div. Inc.*, 442 F.3d 919, 929 (5th Cir. 2006).

61. For that reason, federal courts have long operated under "the presumption that historic police powers of the states are not superseded by federal law"—especially with regard to "health and safety matters," which "are matters that historically have been areas of state regulation." *MacDonald v. Monsanto Co.*, 27 F.3d 1021, 1023 (5th Cir. 1994).

62. Here, ICE's stated intent to violate the Surgeon General's SHO Orders in favor of a federal release order runs afoul of these foundational principles.

63. There can be no question that the Richwood and Basile facilities—private facilities that ICE does not even own—are subject to the Surgeon General's SHO Orders directed specifically at them. In fact, ICE appears to implicitly admit that, at least right now (when no federal release order exists), the facilities must comply with the SHO Orders.

64. Nothing in that analysis would change if and when, say, an Article I immigration judge issues an order granting asylum to a potentially infected detainee at Richwood who has not been medically cleared by Louisiana Department of Health. In that scenario, Richwood may no longer have immigration-based detention authority to detain the detainee. But that does not affect Richwood's

11

*independent* obligation subject to the Surgeon General's SHO Orders to hold that detainee until they are medically cleared.

65. In this way, this case is nothing like other preemption cases in the immigration context where a state law purportedly attempts to dictate, or interfere with, the federal government's immigration operations. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387 (2012). Here, ICE's position is that its authority to conduct immigration-related operations *runs out* whenever it receives a release order— that is, ICE has *no* more authority to exercise over the detainee. The result is that there is no conflict between a federal law and a state law in the immigration context. The *only* law operating on a particular detainee at that point is Surgeon General Abraham's SHO Orders requiring the ICE contract facility to hold the detainee unless and until medically cleared.

66. ICE's stated intent to flout the Surgeon General's SHO Orders thus directly abridges the State's sovereign police powers and its right to protect and defend Louisiana's public health against pre-XDR TB.

### COUNT II (All Defendants)
### Violation of APA, 5 U.S.C. § 706(2)(A)
### Arbitrary and Capricious

67. The State repeats and incorporates by reference each of the Complaint's allegations stated above.

68. ICE's stated intent to violate the Surgeon General's SHO Orders also must be set aside because it is arbitrary and capricious. 5 U.S.C. § 706(2)(A).

69. "[A]rbitrary and capricious review ... has 'serious bite.'" *Louisiana v. Dep't of Educ.*, 90 F.4th 461, 470 (5th Cir. 2024); *see* Sanne H. Knudsen, *The Flip Side of* Michigan v. EPA*: Are Cumulative Impacts Centrally Relevant?*, 2018 Utah L. Rev. 1, 41 (2018) ("In that way, the arbitrary and capricious review is a valuable check on ensuring expert agencies do not stray too far beyond congressional commands or common sense.").

70. Federal agencies act contrary to common sense, however, when they fail to weigh the costs and benefits of their actions. *Mexican Gulf Fishing Co. v. United States Dep't of Com.*, 60 F.4th 956, 973 (5th Cir. 2023); *Chamber of Com. v. SEC*, 85 F.4th 760, 776 n.22 (5th Cir. 2023). Or, they completely ignore "an important aspect of the problem" in favor of a preferred policy outcome. *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021); *cf. Dabertin v. HCR Manor Care, Inc.*, 373 F.3d 822, 829 (7th Cir. 2004) (ERISA plan administrator's definition of plan term "defied common sense and was not in accord with the ordinary and popular meaning of the term, and therefore was arbitrary and capricious"). Or, they demonstrate "a clear error of judgment" by altogether rejecting significant, viable alternatives, *see 10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 723 (5th Cir. 2013), particularly when real economic impacts or reliance interests are in play, *see Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1139 (5th Cir. 2021); *see also N. Carolina Fisheries Ass'n, Inc. v. Daley*, 27 F. Supp. 2d 650, 661 (E.D. Va. 1998).

71. ICE's stated intent to violate the Surgeon General's SHO Orders runs roughshod over these basic administrative law principles and common sense.

72. *First*, there is no dispute that Louisiana is in a public health crisis—yet ICE proposes to compound that massive problem by requiring Louisiana Department of Health officials to take on the additional task of preparing medically sufficient housing, food, and care for an unknown number of potentially infected detainees that ICE intends to release into the State.

73. To be clear: Having already created one public health problem for the State (a potential outbreak of TB within the facilities named above), ICE intends to create a *second*: what to do with ICE detainees released into the public who have not been medically cleared.

74. This makes zero sense, particularly when common sense suggests that preventing any public release of potentially infected detainees in the first place is the quickest way to stop a TB outbreak.

13

75. *Second*, it also makes zero sense to move a currently quarantined and/or isolated detainee out of that setting, just to place them in an identical setting elsewhere. Again, common sense suggests that the safest route is to maintain the status quo as the authorities seek to medically clear all potentially infected detainees.

76. For these reasons, ICE's stated intent to violate the Surgeon General's Orders is arbitrary and capricious.

## COUNT III (CDC, Cohen, NCHHSTP, Mermin)
### Violation of APA, 5 U.S.C. § 706(1)
### Agency Action Unlawfully Withheld

77. The State repeats and incorporates by reference each of the Complaint's allegations stated above.

78. ICE's stated intent to violate the Surgeon General's SHO Orders tees up a separate APA problem—namely, CDC's failure thus far to *itself* require the precise isolation and quarantine that the Louisiana Surgeon General has ordered. *See* 5 U.S.C. § 706(1) (a reviewing court "shall ... compel agency action unlawfully withheld or unreasonably delayed").

79. CDC enjoys specific statutory authority "to make and enforce such regulations as in [its] judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession." 42 U.S.C. § 264(a). That includes the authority to "provide for the apprehension, detention, or conditional release of individuals" for the purposes of preventing the spread of TB, specifically. *See id.* § 264(b); *What Diseases Are Subject to Federal Isolation and Quarantine Law*, U.S. Dep't of Health & Human Servs., https://tinyurl.com/bdh9n95n (identifying TB).

80. Moreover, CDC has in fact promulgated regulations authorizing "the apprehension, medical examination, quarantine, isolation, or conditional release of any individual for the purpose of preventing the introduction, transmission, and spread of quarantinable communicable diseases." 42

14

C.F.R. § 70.6(a); *id.* § 70.14 (outlining the requirements for issuance of such an order). The regulations further provide that CDC "will arrange for adequate food and water, appropriate accommodation, appropriate medical treatment, and means of necessary communication for individuals who are apprehended or held in quarantine or isolation under this part." *Id.* § 70.6(b).

81.  These isolation and quarantine measures are precisely what Surgeon General Abraham has ordered—but where is CDC, particularly given that a federal government agency created this public emergency in the first place by bringing to Louisiana a pre-XDR positive patient?

82.  CDC's silence here presents at least two legal points for present purposes. *First*, if CDC argues that it has *discretion* but no legal *obligation* to issue against the Richwood and Basile facilities the orders Surgeon General Abraham has issued (and that Title 42 and CDC's own regulations authorize), that would be a shocking abdication of CDC's responsibility to protect the public health. It is undisputed that there is a public health crisis at these facilities and that a remarkably dangerous form of TB is loose. For CDC to throw up its hands and say this is not the right scenario for an exercise of its Title 42 authority, therefore, would be truly shocking. Accordingly, the State urges the Court to issue an order requiring CDC to immediately show cause why it should not issue a Title 42 order against the Richwood and Basile facilities.

83.  *Second*, and at a minimum, CDC's statutory and regulatory framework illustrates that ICE's "this can just be the State's problem once we release a potentially infected detainee" approach is profoundly wrong.

84.  For one thing, Congress specifically included a "Preemption" provision in Title 42 that says: "Nothing in this section ..., or the regulations promulgated under such section[], may be construed as superseding any provision under State law (including regulations and including provisions established by political subdivisions of States), except to the extent that such a provision conflicts with an exercise of Federal authority under this section[.]" 42 U.S.C. § 264(e). In other words, where ICE

15

proposes to drive a knife through the Surgeon General's SHO Orders, his enforcement of Louisiana's public health law is expressly protected under CDC's own statutory framework—especially here, where his exercise of his authority is avowedly consistent with CDC's own authority.

85. For another thing, CDC's own regulations recognizes *CDC's* responsibility to "arrange for adequate food and water, appropriate accommodation, appropriate medical treatment, and means of necessary communication for individuals who are apprehended or held in quarantine or isolation under this part." 42 C.F.R. § 70.6(b). In other words, where ICE proposes to foist these obligations on the State itself, CDC's own regulatory framework accepts that this is CDC's financial and practical burden where the crisis falls under CDC's authority. Indeed, this contrast is especially stark here since the very problem ICE proposes to foist on the State is a problem of the federal government's own creation.

## PRAYER FOR RELIEF

The State therefore requests that the Court enter an order and judgment that grants the following relief, which it is authorized to do under 5 U.S.C. §§ 702, 705, 28 U.S.C. § 2201, and Federal Rules of Civil Procedure 57 and 65:

a. An immediate temporary restraining order, and then a preliminary injunction and a permanent injunction, preventing ICE and the Richwood and Basile facilities from releasing any detainee unless and until the Louisiana Department of Health has medically cleared that detainee.

b. If the Court deems it necessary, an order to CDC to immediately show cause why it should not issue an order pursuant to Title 42 of the U.S. Code, requiring the isolation and/or quarantine of detainees at the Richwood and Basile facilities unless and until they are medically cleared by the Louisiana Department of Health.

    c. Declare that ICE's stated intent to violate the Surgeon General's SHO Orders is contrary to constitutional right and power and arbitrary and capricious under the APA.

    d. Compel CDC to take the unlawfully withheld action of a Title 42 order requiring isolation and quarantine at the Richwood and Basile facilities.

    e. Grant all other relief the Court deems just and proper, as well as reasonable attorneys' fees and the costs of this action.

Dated: October 16, 2024                      Respectfully submitted,

**ELIZABETH B. MURRILL**
**Attorney General of Louisiana**

*/s/ Zachary Faircloth*
J. Benjamin Aguiñaga*
  *Solicitor General*
Zachary Faircloth (La #39875)
  *Principal Deputy Solicitor General*
Caitlin A. Huettemann (La #40402)
  *Assistant Solicitor General*
OFFICE OF THE LOUISIANA ATTORNEY GENERAL
1885 North Third Street
Baton Rouge, LA 70804
(225) 326-6766
aguinagab@ag.louisiana.gov
fairclothz@ag.louisiana.gov
huettemannc@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

*pro hac forthcoming

17