**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION**

|  |  |
|---|---|
| STATE OF LOUISIANA, | |
| *Plaintiff*, | |
| v. | Civil No. 24-cv-01422 |
| ALEJANDRO MAYORKAS, *et al.*, | JUDGE DAVID C. JOSEPH |
| *Defendants*. | MAGISTRATE JUDGE DAVID J. AYO |

**FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFF STATE OF LOUISIANA'S
EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION..............................................................................................................................1

BACKGROUND ..............................................................................................................................2

I.      Immigration and Nationality Act..............................................................................2

II.     ICE and ICE Health Services Corps.........................................................................3

III.    Tuberculosis and IHSC's Tuberculosis Protocols....................................................4

IV.     The Index Patient......................................................................................................5

V.      Response to the Index Patient ...................................................................................7

LEGAL STANDARDS.....................................................................................................................9

ARGUMENT....................................................................................................................................9

I.      The State is unlikely to succeed on the merits of its claims......................................9

        A.      The Supremacy Clause bars the injunctive relief the State requests. .............9

        B.      The INA bars the injunctive relief the State requests. ...................................13

        C.      Counts 1 and 2 do not challenge final agency action. ....................................13

        D.      Count 3 does not state a justiciable § 706(1) claim........................................15

        E.      The State's Tenth Amendment claim is meritless...........................................17

        F.      The State's arbitrary-and-capricious claim is meritless..................................19

II.     The State has not shown it will suffer irreparable harm absent preliminary relief. ..................20

III.    A preliminary injunction would disserve the public interest...................................21

CONCLUSION...............................................................................................................................22

# TABLE OF AUTHORITIES

**CASES**

*Allied Mktg. Grp., Inc. v. CDL Mktg.*, Inc.,
878 F.2d 806 (5th Cir. 1989) ................................................................................10

*Anglers Conserv. Network v. Pritzker*,
809 F.3d 664 (D.C. Cir. 2016) ........................................................................ 16, 17

*Arizona v. California*,
283 U.S. 423 (1931) ..............................................................................................11

*Arizona v. United States*,
567 U.S. 387 (2012) ..............................................................................................18

*Boeing Co. v. Movassaghi*,
768 F.3d 832 (9th Cir. 2014) .......................................................................... 11, 13

*Brackeen v. Haaland*,
994 F.3d 249 (5th Cir. 2021) ................................................................................19

*Case v. Bowles*,
327 U.S. 92 (1946) ................................................................................................19

*Chacon v. Granata*,
515 F.2d 922 (5th Cir. 1975) ................................................................................21

*Data Marketing Partnership, LP v. U.S. Dep't of Labor*,
45 F.4th 846 (5thCir. 2022) ..................................................................................14

*Demore v. Kim*,
538 U.S. 510 (2003) ................................................................................................3

*Duarte v. City of Lewisville*,
136 F. Supp. 3d 752 (E.D. Tex. 2015) ..................................................................21

*Eastland v. U.S. Servicemen's Fund*,
421 U.S. 491 (1975) ..............................................................................................22

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ..............................................................................................20

*FCC v. Prometheus Radio Project (Prometheus)*,
141 S. Ct. 1150 (2021) ..........................................................................................20

i

*Flores v. Garland,*
   72 F.4th 85 (5th Cir 2023) ........................................................................................17

*Garcia v. San Antonio Metro. Transit Auth.,*
   469 U.S. 528 (1985) .................................................................................................19

*Garland v. Aleman Gonzalez,*
   596 U.S. 543 (2022) .................................................................................................14

*GEO Group, Inc. v. City of Tacoma,*
   2019 WL 5963112 (W.D. Wash. Nov. 13, 2019) ....................................................13

*Geo Group, Inc. v. Newsom,*
   50 F.4th 745 (9th Cir. 2022) ............................................................................. 10, 12

*Hancock v. Train,*
   426 U.S. 167 (1976) .................................................................................................11

*Heckler v. Chaney,*
   470 U.S. 821 (1985) .................................................................................................17

*Hodel v. Va. Surface Mining & Reclamation Ass'n,*
   452 U.S. 264 (1981) .................................................................................................19

*Holland Am. Ins. Co. v. Succession of Roy,*
   777 F.2d 992 (5th Cir. 1985) ...................................................................................21

*Jacksonville Port Auth. v. Adams,*
   556 F.2d 52 (D.C. Cir. 1977) ..................................................................................22

*John Doe Co. v. CFPB,*
   849 F.3d 1129 (D.C. Cir. 2017) ..............................................................................21

*Kelley v. United States,*
   69 F.3d 1503 (10th Cir. 1995) .................................................................................19

*Kerr v. U.S. Dist. Ct. for N. Dist. of Cal.,*
   426 U.S. 394 (1976) .................................................................................................17

*La. State v. U.S. Army Corps of Engineers,*
   834 F.3d 574 (5th Cir. 2016) ...................................................................................16

*League of Women Voters of the U.S. v. Newby,*
   838 F.3d 1 (D.C. Cir. 2016) ....................................................................................21

*Leslie Miller, Inc. v. Arkansas,*
   352 U.S. 187 (1956) .................................................................................................12

*Lincoln v. Vigil,*
  508 U.S. 182 (1993) ..............................................................................................17

*Luminant Generation Co., LLC v. EPA,*
  757 F.3d 439 (5th Cir. 2014) ...............................................................................16

*Madsen v. Women's Health Ctr., Inc.,*
  512 U.S. 753 (1994) ..............................................................................................23

*Maryland v. King,*
  567 U.S. 1301 (2012) ............................................................................................22

*Maryland v. Wirtz,*
  392 U.S. 183 (1968) ..............................................................................................19

*Mayo v. United States,*
  319 U.S. 441 (1943) ..............................................................................................11

*Mazurek v. Armstrong,*
  520 U.S. 968 (1997) ..............................................................................................10

*McCulloch v. Maryland,*
  17 U.S. 316 (1819) ........................................................................................ 10, 11

*Memphis A. Philip Randolph Inst. v. Hargett,*
  978 F.3d 378 (6th Cir. 2020) ...............................................................................21

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.,*
  434 U.S. 1345 (1977) ............................................................................................22

*New York v. United States,*
  505 U.S. 144 (1992) ..............................................................................................18

*Nken v. Holder,*
  556 U.S. 418 (2009) ..............................................................................................21

*Norton v. S. Utah Wilderness All. (SUWA),*
  542 U.S. 55 (2004) ........................................................................................ 16, 17

*Osborn v. Bank of U.S.,*
  22 U.S. 738 (1824) ................................................................................................12

*Pub. Utils. Comm'n v. United States,*
  355 U.S. 534 (1958) ..............................................................................................12

*Pursuing Am.'s Greatness v. FEC,*
  831 F.3d 500 (D.C. Cir. 2016)..............................................................................21

*Tex. Tech Phys. Assocs. v. HHS,*
  917 F.3d 837 (5th Cir. 2019) ...............................................................................................20

*Town of Johnston v. Fed. Hous. Fin. Agency,*
  765 F.3d 80 (1st Cir. 2014) ...................................................................................................19

*Trump v. Thompson,*
  20 F.4th 10 (D.C. Cir. 2021).................................................................................................22

*Trump v. Vance,*
  140 S. Ct. 2412 (2020) ................................................................................................... 10, 11

*U.S. Army Corps of Eng'rs v. Hawkes Co.,*
  578 U.S. 590 (2016) ..............................................................................................................14

*Union Pac. R. Co. v. Peniston,*
  85 U.S. 5 (1873)......................................................................................................................11

*United States v. California,*
  921 F.3d 865 (9th Cir. 2019) ......................................................................................... 12, 13

*United States v. Comstock,*
  560 U.S. 126 (2010) ..............................................................................................................18

*United States v. DeCay,*
  620 F.3d 534 (5th Cir. 2010) ...............................................................................................18

*United States v. Mikhel,*
  889 F.3d 1003 (9th Cir. 2018) .............................................................................................18

*United States v. Texas,*
  566 F. Supp. 3d 605 (W.D. Tex. 2021)......................................................................... 13, 21

*United States v. Town of Windsor,*
  765 F.2d 16 (2d Cir. 1985)....................................................................................................12

*United States v. Washington,*
  142 S. Ct. 1976 (2022) ..........................................................................................................10

*Walmart Inc. v. U.S. Dep't of Justice,*
  21 F.4th 300 (5th Cir. 2021) .................................................................................................15

*White v. Carlucci,*
  862 F.2d 1209 (5th Cir. 1989) ..............................................................................................21

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008)......................................................................................................................9

*Zadvydas v. Davis*,
  533 U.S. 678 (2001) ...................................................................................................3

**CONSTITUTION**

U.S. Const. art. VI, cl. 2 ...........................................................................................10

U.S. Const. amend. X ...............................................................................................18

**STATUTES**

5 U.S.C. § 551 ...........................................................................................................15

5 U.S.C. § 701 ...........................................................................................................17

5 U.S.C. § 704 .....................................................................................................14, 15

5 U.S.C. § 706 .................................................................................................16, 17, 18

8 U.S.C. § 1101 ...........................................................................................................3

8 U.S.C. § 1221 .......................................................................................................3, 14

8 U.S.C. § 1222 .......................................................................................................3, 14

8 U.S.C. § 1223 .......................................................................................................3, 14

8 U.S.C. § 1224 .......................................................................................................3, 14

8 U.S.C. § 1225 .......................................................................................................3, 14

8 U.S.C. § 1226 .......................................................................................................3, 14

8 U.S.C. § 1227 .......................................................................................................3, 14

8 U.S.C. § 1228 .......................................................................................................3, 14

8 U.S.C. § 1229 .......................................................................................................3, 14

8 U.S.C. § 1230 .......................................................................................................3, 14

8 U.S.C. § 1231 .......................................................................................................3, 14

8 U.S.C. § 1232 ..........................................................................................................14

8 U.S.C. § 1252 ..........................................................................................................13

42 U.S.C. § 264 .......................................................................................................................17

## REGULATIONS

42 C.F.R. Part 70 ...................................................................................................................16

42 C.F.R. § 70.6 ................................................................................................................ 16, 17

42 C.F.R. Part 71 ...................................................................................................................16

48 C.F.R. § 301.204-90 ...........................................................................................................4

## INTRODUCTION

Last week, the State of Louisiana filed an emergency motion for a temporary restraining order and a preliminary injunction to prevent the U.S. Department of Homeland Security ("DHS"), the U.S. Immigration and Customs Enforcement ("ICE"), and two federal contractors that operate two ICE detention facilities in Louisiana from releasing any ICE detainees from those facilities unless the State has medically cleared them. This extraordinary request was premised on allegations about ICE's handling of a detainee who tested positive for tuberculosis ("TB") in the summer of 2024 and is now undergoing medical treatment. DHS recognizes the importance of safeguarding the public health and has handled this situation carefully. Nothing about its response warrants the relief the State seeks.

In July of this year, ICE detained a noncitizen (hereafter referred to as the "Index Patient") at a detention facility in Monroe pending her expedited removal from the country. Days after entering ICE custody, the Index Patient tested positive for TB. In response, medical staff at the ICE detention facility followed ICE's TB protocols, ordering further tests and isolating the Index Patient from all detainees at the facility. Within a few days, ICE transferred the Index Patient to another ICE detention facility in Basile to isolate her in a negative pressure room and begin appropriate TB treatment. Again, the facility's medical staff followed ICE's TB protocols, and after receiving weeks of treatment and showing no signs of active TB, the Index Patient was allowed to join the facility's general detainee population. The medical staff monitored the situation for a couple weeks, retesting the Index Patient, who again tested positive. So, consistent with the proper protocols, the medical staff re-isolated the Index Patient and referred her to a local hospital for continued isolation and TB treatment. And that is where she has remained to date.

Since then, ICE has been working to ensure that operations at these two detention facilities continue to follow the proper protocols when there is a positive TB case, and by all indications they have. Moreover—and in stark contrast to the story the State tells—ICE, its two facilities, and CDC

have been working closely with LDH to manage this situation and prevent any TB spread. Both facilities, for example, have followed the Louisiana Surgeon General's medical recommendations, and LDH has been monitoring and conducting tests of detainees and staff at both facilities. The results of this coordinated effort—which both ICE and CDC intend to continue—are promising: At both facilities, there is *no* ongoing exposure to TB and *no* active or symptomatic TB cases, and there have been *no* identified cases of active TB (other than the Index Patient) and *no* identified cases of the Index Patient having transferred TB. And while ICE is obligated to comply with federal immigration laws, including releasing any detainee who it no longer has authority to detain, ICE has been clear with the State that it will work with LDH to ensure all appropriate actions are taken, and to assist with the transfer of custody to LDH, in the event ICE is legally required to release a detainee.

The State's assertion that this Court's intervention is needed to stave off "a public health emergency" thus finds no support in the facts. The question before the Court is whether the State has shown it is entitled to the extraordinary remedies it seeks. It has not. Both the Constitution and a federal statute prohibit any injunction along the lines of what the State is seeking, as such relief would interfere with the federal government's immigration operations. The State also has asserted no claim that would justify this Court entering a "show cause" order to the CDC to explain why it has not exercised its quarantine or isolation authorities. And merits aside, the equities tilt decidedly in favor of the Federal Defendants.

For those reasons and others explained below, this Court should deny the State's motion for a preliminary injunction and rescind the temporary restraining order entered on October 18, 2024.

## BACKGROUND

### I.    Immigration and Nationality Act

The Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq.*, charges the Department of Homeland Security ("DHS") with implementing and enforcing the immigration laws governing the

2

inspection, apprehension, examination, and removal of noncitizens. *See id.* §§ 1221–1231. To carry out those duties, DHS is authorized to detain noncitizens in certain circumstances during immigration proceedings and pending removal. *See id.* § 1225(b)(1)(B)(ii), (b)(2)(A); *id.* § 1226(a), (c)(1); *id.* § 1231(a)(2), (6). Those circumstances include while noncitizens' immigration proceedings are pending (*i.e.*, pre-order detention) and after their removal proceedings conclude and an Immigration Judge has ordered the noncitizen removed (*i.e.*, post-order detention).

DHS's detention authority is limited, however. It is authorized to detain noncitizens for civil immigration offenses only "for the limited period necessary for their removal proceedings," *Demore v. Kim*, 538 U.S. 510, 526 (2003), and may not indefinitely detain noncitizens with final orders of removal whom it cannot realistically remove, *Zadvydas v. Davis*, 533 U.S. 678, 699 (2001). Accordingly, after 180 days have passed following a noncitizen's final order of removal—a presumptively reasonable period for post-order detention—DHS generally must release the noncitizen when there is no "significant likelihood of removal in the reasonably foreseeable future," *Id.* at 701, regardless of whether he or she is a flight risk or a danger to the community. Additionally, DHS is authorized to detain only noncitizens while a removal decision is pending. *See* 8 U.S.C. § 1226(a)–(c). That means that once an Immigration Judge has found that a noncitizen is not removable or has granted a noncitizen relief from removal, DHS no longer has authority to detain the individual. And where DHS lacks authority to continue detaining a noncitizen, the agency is *statutorily obligated* to release the individual from its custody.

## II.    ICE and ICE Health Services Corps

ICE, a component of DHS, is responsible for immigration detention. ICE both operates some of its own detention facilities and contracts with private contractors (who run facilities owned either by the contractor or the federal government) or local, state, or other federal agencies to carry out certain detention responsibilities. *See* 48 C.F.R. § 301.204-90.

3

ICE Health Services Corps ("IHSC") is a component of ICE that provides medical care to thousands of detainees housed at IHSC-staffed ICE detention facilities throughout the country. *See* Ex. A, Declaration of Dr. Ada Rivera ¶ 2. IHSC comprises a multidisciplinary workforce, including U.S. Public Health Service Commissioned Corps ("USPHS") officers, civil servants, and contract health professionals. *Id.* ¶ 3. Field Medical Coordinators ("FMCs") within IHSC serve as medical consultants to ICE field offices, and oversee compliance with ICE detention standards at non-IHSC-staffed facilities. *Id.* at ¶ 4. This includes the Richwood Correctional Center, operated by LaSalle Corrections in Monroe, Louisiana, and South Louisiana ICE Processing Center ("Basile"), operated by GEO Group in Basile, Louisiana. *Id.* Medical staff at these facilities are responsible for providing medical care to detainees, and both facilities are contractually obligated to comply with ICE Performance Based National Detention Standards.[1] *Id.* ¶¶ 5, 10.

III.   **Tuberculosis and IHSC's Tuberculosis Protocols**

Tuberculosis ("TB") is a pathogenic bacteria that infects the lungs. "Drug-resistant" TB is a strain resistant to at least one of the most effective TB medicines used in treatment regimens, and *multi*-drug resistant TB is resistant to at least the most effective first-line TB treatment drugs. *Id.* ¶ 9. One type of MDR TB is "pre-extensively drug-resistant TB," or "pre-XDR TB," which is TB bacteria resistant to both first- and second-line anti-TB medications. Pre-XDR TB is difficult to treat. *Id.*

To test for a TB infection, an individual may be given a skin test or a chest X-ray. Skin tests results are read 48 to 72 hours after placement. *Id* at ¶ 15. If positive, the patient is referred for a chest X-ray. *Id.* If a patient has both a positive skin test and an indeterminate chest X-ray, the patient is isolated in a negative pressure room. *Id.* Importantly, a positive skin test does not mean a patient has active TB (as opposed to latent TB), but merely indicates that the patient has been exposed to TB or has received the BCG vaccine, which is used by countries outside of the United States. *Id.* ¶ 16. The

---

[1] Publicly available at: https://www.ice.gov/detain/detention-management/2011.

populations that ICE encounters typically have a higher positivity rate from skin tests because they come from countries that use the BCG vaccine. *Id.* A patient that has received only one positive skin test cannot be linked to a particular exposure because that patient could have been exposed to TB previously. *Id.* A positive skin test also could indicate a latent TB infection (which is not contagious) but not necessarily active TB disease. *Id.* (In this case, although some detainees have received positive skin tests, none besides the Index Patient have been diagnosed with active TB. *Id.* ¶ 8.)

IHSC has established TB protocols. *Id.* ¶ 14. These include respiratory isolation, chest X-ray, collection of sputum samples, and the RIPE antibiotic treatment regimen (a TB treatment regimen consisting of four antibiotics and anti-infectives used to treat TB: Rifampin, Isoniazid, Pyrazinamide, and Ethambutol). *Id.* Detainees with symptoms suggestive of TB, or with suspected or confirmed TB, are housed in an airborne infection isolation room with negative pressure ventilation and promptly evaluated for TB. *Id.* ¶ 17. A detainee with suspected TB will remain in that setting until a practitioner determines, in accordance with CDC guidelines, that the detainee is not contagious. After five days of treatment, with negative AFB smears[2] and a negative chest X-ray, patients can return to the general population, where they are monitored until culture results return. *Id.* ¶ 14. Local health departments also are advised and consulted regarding the patient. *Id.* Contact investigations depend on level of infectivity, and treatment varies based on the resistance testing. *Id.*

## IV. The Index Patient

On July 13, 2024, U.S. Border Patrol ("USBP") encountered the Index Patient when it determined that she had unlawfully entered the country. *See* Ex. B, Declaration of Scott G. Ladwig, at ¶ 6. On July 20, 2024, USBP transferred the Index Patient from California to ERO New Orleans via an ICE Air Operations aircraft carrying 127 other detainees. *Id.* ¶ 7. USBP then transported the Index

---

[2] An Acid-Fast Bacilli ("AFB") smear is the result from an AFB test, which tests for TB in sputum, a mixture of mucus and saliva coughed up from the respiratory tract. *See* Rivera Decl. ¶ 15.

Patient by bus to the Richwood facility, where she arrived on July 20. *Id.*

*Richwood.* Upon arriving at Richwood, facility medical staff skin tested the Index Patient for TB at intake. *See* Rivera Decl. ¶ 20. ICE detention standards require that all new arrivals receive TB screening within 12 hours of intake, in accordance with CDC guidelines. *Id.* ¶ 11. The Index Patient was not in isolation between July 20 and July 23. *Id.* On July 23, staff read the Index Patient's skin test, which was positive, at which point the Index Patient was transferred to Ochsner LSU Health Monroe to have a chest X-ray, per IHSC's TB protocol. *Id.* at ¶ 21. The chest X-ray indicated active TB. The hospital notified Richwood, who then ordered the Index Patient transferred to Glenwood Regional Medical Center for further testing. *Id.*

The attending physician at Glenwood admitted the Index Patient with a diagnosis of active TB. On July 26, Glenwood discharged the Index Patient with an updated diagnosis of pneumonia, not TB, and she returned to Richwood. *Id.* The receiving physician at Richwood, who still suspected TB notwithstanding the Index Patient's discharge diagnosis at Glenwood, ordered the Index Patient placed in an isolated medical observation room with airborne precautions, and Richwood requested a transfer to another facility capable of a higher level of care and with a negative pressure room. *Id.* Between July 26 and July 29, the Index Patient was isolated from all detainees in Richwood's medical isolation room. *Id.*

Twelve and a half weeks have passed since July 29, the Index Patient's last day at Richwood. *Id.* at ¶ 18. The incubation period for TB is only eight to ten weeks. *Id.* No detainee at Richwood has had any contact with the Index Patient since July 23—thirteen and a half weeks ago—and no other cases of TB have been identified at Richwood. *Id.* ¶¶ 21–22.

*Basile.* On July 29, ICE transferred the Index Patient to the Basile facility, which has three negative pressure rooms. *Id.* at ¶ 23. Upon arrival, medical staff isolated the Index Patient in a negative pressure room. *Id.* Basile medical staff collected a blood sample for TB testing, which later came back

positive, and ordered medications for RIPE therapy. *Id.* The Index Patient began RIPE therapy on August 13. *Id.* She remained isolated in that the negative pressure room from July 29 until August 16. *Id.* Consistent with IHSC clinical practice and CDC guidance, after (i) receiving a chest X-ray showing no changes, (ii) receiving a negative AFB smear tests, (iii) undergoing five days of RIPE therapy, and (iv) showing no symptoms of active TB, the Index Patient was allowed to join Basile's general population on August 17. *Id.*

On September 8, 10, and 12, Basile medical staff again tested the Index Patient for TB by collecting sputua (saliva and mucus coughed up). *Id.* at ¶ 24. On September 11, the Index Patient developed a persistent cough. *Id.* The first AFB smear came back positive on September 13. *Id.* ¶ 25. Basile medical staff notified the Louisiana Department of Health ("LDH") of a possible TB infection in one patient and placed the Index Patient back into a negative pressure room on September 17. *Id.* On September 18, LDH went to Basile and collected two sputa. *Id.* On September 19, Basile medical staff referred the Index Patient to a local hospital, where she was admitted for active TB and placed in isolation rooms at University Hospital and Clinics in Lafayette, Louisiana. *Id.* ¶ 27. On October 9, LDH received test results confirming that the Index Patient has pre-XDR TB. *Id.* ¶ 28. On October 16, the hospital issued discharge orders for the Index Patient. *Id.* at ¶ 29. LDH is currently requiring the Index Patient to remain at the hospital. *Id.*

Besides the Index Patient, there have been no other identified cases of active TB in Richwood or Basile, and there have been no identified cases of the Index Patient transferring TB. *Id.* ¶ 8.

## V.     Response to the Index Patient

In addition to the preventative and treatment measures described above, ICE has worked to ensure that its operations adhere to applicable protocols related to a positive TB occurrence. On October 10, 2024, the Louisiana Surgeon General issued a verbal directive, ordering that all ICE detainees at Richwood and Basile be skin tested and cohorted. *See* Ladwig Decl. ¶ 8. Both facilities

identified and cohorted the primary and secondary contacts of the Index Patient, and followed the Louisiana Surgeon General's medical recommendations while working closely with the LDH. *See* Rivera Decl. ¶ 28. The facilities have conducted screening, follow-up testing, and medical evaluations. *Id.*

On October 15, 2024, ICE held a meeting with Louisiana's Attorney General, Solicitor General, and Surgeon General and LDH employees. *See* Ladwig Decl. ¶ 9. The Louisiana representatives stated their concerns regarding the conditions of the Index Patient's detention, demanding that Richwood and Basile halt to all intake and release activities. While ICE volunteered to take certain steps in light of the State's concerns, it explained concerns regarding the risk of exceeding the limits of its detention authority. *Id.* ICE agreed to provide LDH with 24-hour notice of a detainee's potential release from Richwood or Basile.

As of October 17, LDH was conducting testing of Basile detainees and staff, and has tested some detainees and staff at Richwood, with follow-up tests on October 30. *See* Rivera Decl. ¶ 26–27. LDH is not asking that Basile or Richwood staff quarantine or to report their contacts for tracing. *Id.* LDH also is monitoring post-exposure testing results at both facilities. *Id.* ¶ 35. At both facilities, there are currently no active TB cases at either facility, no ongoing exposure to TB, and no symptomatic TB cases. *Id.* T-spot testing has been performed by LDH at both facilities and will be repeated at 8 weeks after a detainee's exposure. *Id.* ¶¶ 33–35.

*Richwood.* Because the incubation period for XDR-TB is eight to ten weeks, the detainees at Richwood no longer pose a threat of exposure to the public. *Supra* 7. Until recently, there were only two individuals detained at Richwood that were in primary contact with the Index Patient. Those two individuals have tested negative for TB. LDH medically cleared those detainees and advised that they could leave isolation on October 24. *See* Ladwig Decl. ¶ 9.

*Basile.* Due to certain security measures required for Basile, approximately 92 noncitizens are

8

classified as "high level" detainees. *Id.* ¶ 20. At all times. these detainees are isolated from the low- and medium-level detainees. *Id.* The Index Patient was classified as a low/medium-level detainee, and had no contact with the 92 high-level detainees. *Id.* Those detainees have tested negative for TB and have been medically cleared to travel internationally so they can be removed from the country. *Id.* Thirty detainees were transferred to Basile after October 10, when the facility started T-spot testing and cohorting detainees. *Id.* Those 30 detainees have had no contact with the Index Patient.

## LEGAL STANDARDS

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To justify this "drastic remedy," a plaintiff must make a "*clear showing*" that (1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable harm without the requested injunction; (3) the balance of equities tips in its favor; and (4) preliminary relief serves the public interest. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Failure to demonstrate any one of these elements requires denial of preliminary relief. *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989).

## ARGUMENT

**I.      The State is unlikely to succeed on the merits of its claims.**

**A.      The Supremacy Clause bars the injunctive relief the State requests.**

In this lawsuit, the State principally asks this Court to enjoin ICE "from releasing any detainee" from ICE's Richwood and Basile detention facilities without LDH's medical clearance, as the Louisiana Surgeon General has ordered. *See* Compl. ¶¶ 15–16. The upshot of this relief would be the subordination of federal immigration operations to a state law medical-clearance process not required under federal law. But the Constitution flatly prohibits that outcome.

The Supremacy Clause provides that "the Laws of the United States" are "the supreme Law of the Land," state law "notwithstanding." U.S. Const. art. VI, cl. 2. In that way, "[t]he Constitution

9

guarantees the entire independence of the General Government from any control by the respective States." *Trump v. Vance*, 140 S. Ct. 2412, 2425 (2020) (citation omitted). The Supremacy Clause thus prohibits, among other things, "States from interfering with or controlling the operations of the Federal Government." *United States v. Washington*, 142 S. Ct. 1976, 1984 (2022).

This foundational principle—"embodied in the doctrine of intergovernmental immunity— traces its origin" to *McCulloch v. Maryland*, 17 U.S. 316 (1819). *Geo Group, Inc. v. Newsom*, 50 F.4th 745, 754 (9th Cir. 2022) (en banc). There, Chief Justice Marshall explained that states cannot interfere with the federal government's "legitimate operations": "It is of the very essence of supremacy, to remove all obstacles to [the federal government's] action within its own sphere, and so to modify every power vested in subordinate governments, as to exempt its own operations from their own influence." *Id.* at 427. Two hundred years later, Chief Justice Roberts, writing for the Court, reaffirmed *McCulloch*'s bedrock principle, reiterating that States can neither "control the operations of the constitutional laws enacted by Congress," nor impede the Executive Branch's "execution of those laws." *Trump*, 140 S. Ct. at 2425 (citations omitted). Between the words of Chief Justice Marshall and Chief Justice Roberts lies centuries of Supreme Court precedent holding that "activities of the Federal Government are free from regulation by any state." *Hancock v. Train*, 426 U.S. 167, 178 (1976) (quoting *Mayo v. United States*, 319 U.S. 441, 445 (1943)); *accord, e.g.*, *Arizona v. California*, 283 U.S. 423, 451 (1931) ("The United States may perform its functions without conforming to the police regulations of a state."); *Union Pac. R. Co. v. Peniston*, 85 U.S. 5, 36–37 (1873); *see also Vance*, 140 S. Ct. at 2442–43 & n.5 (Alito, J., dissenting) ("[T]wo centuries of case law prohibit the States from taxing, regulating, or otherwise interfering with the lawful work of federal agencies, instrumentalities, and officers"). And under this precedent, lower courts have repeatedly found violations of intergovernmental immunity where (as here) state laws would "directly interfere with the functions of the federal government." *See, e.g.*, *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839 (9th Cir. 2014).

This Court should too. There's no question that, under the State's requested injunction, the State would directly regulate, and subordinate, the federal government's detention operations at the Richwood and Basile facilities to the orders of a state official and state law. Whether ICE wanted to remove a detainee from the country, release a detainee, or transfer a detainee to a hospital to treat a medical need—in each instance, ICE's detention and removal decisions would be subject to the Louisiana Surgeon General's medical-clearance requirement.[3] Put simply, the State would be able to dictate how and under what circumstances the federal government would be permitted to remove, release, and transfer its own detainees. Such a result would turn the Supremacy Clause on its head. *See Geo Group*, 50 F.4th at 751 ("It would give [the state] a 'virtual power of review' over ICE's detention decisions, and allow the 'discretion of the federal officers to be exercised only if the state approves.' … [The State] cannot exert this level of control over the federal government's detention operations." (cleaned up)).

It makes no constitutional difference, moreover, whether the State achieves these improper ends by explicitly regulating ICE's activities, or by claiming to regulate only GEO and LaSalle, who have contracted with the federal government to provide facilities dedicated solely for ICE detentions. The principle of intergovernmental immunity has long applied with equal force where (as here) states seek to regulate federal contractors in a way that interferes with federal operations. *See, e.g.*, *Osborn v. Bank of U.S.*, 22 U.S. 738, 867 (1824) (Marshall, C.J.); *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190 (1956) (per curiam) (holding that the Supremacy Clause prevented enforcement of a state law requiring building contractors to obtain a state license against a contractor hired on a federal construction project); *Pub. Utils. Comm'n v. United States*, 355 U.S. 534, 543 (1958) (holding that the Supremacy Clause prohibited a state law requiring common carriers to seek approval from a state agency for rates

---

[3] Again, ICE has been clear with the State that it will voluntarily notify and coordinate any transfer of custody with LDH in the event ICE is legally obligated to release a detainee.

negotiated with the federal government to transport federal property). That is because, "[w]hen a state regulation of a contractor would" disrupt "federal operations, enforcement of the substance of the regulation against the contractors would have the same effect as direct enforcement against the Government." *Geo Group*, 50 F.4th at 760 (cleaned up) (quoting *United States v. Town of Windsor*, 765 F.2d 16, 19 (2d Cir. 1985)); *see also United States v. California*, 921 F.3d 865, 880 (9th Cir. 2019) (explaining that intergovernmental immunity is implicated when state laws "directly or indirectly affect[] the operation of a federal program or contract"). So it would be no answer for the State to suggest that the Louisiana Surgeon General's orders regulate only GEO and LaSalle, because the impact on the federal government's operations remains the same: ICE's removal, release, and transfer activities are constrained by the Louisiana Surgeon General's medical-clearance requirement. That is every bit as constitutionally repugnant as explicitly regulating the United States.

In this vein, the State creatively claims that it can require an "ICE contract facility to hold [an ICE] detainee" once ICE loses detention authority over the detainee. *See* Mot. 5. That, of course, says nothing about the State's effort to regulate ICE's *removal* and *transfer* decisions, and also ignores the fact that keeping these individuals detained in the same facility would still interfere with ICE's operations (*e.g.*, limiting bedspace). But regardless, the State's argument cuts the bologna too thin. ICE has contracted with GEO and LaSalle to provide the Richwood and Basile facilities as "dedicated" facilities, meaning they are dedicated solely for ICE detentions. *See* Ladwig Decl. ¶ 4. Requiring GEO and LaSalle to use these facilities for any other purpose would thus interfere with their ability to "discharge [their] contractual obligations" consistent with the terms agreed upon with the federal government. *See Boeing*, 768 F.3d at 839. That too violates the principle of intergovernmental immunity. *See, e.g.*, *id.* (holding that intergovernmental immunity precluded enforcement of state law where it "directly interfere[d] with the functions of the federal government" by "regulat[ing] not only the federal contractor but the effective terms of [the] federal contract itself"); *United States v. California*, 921

12

F.3d 865, 880 (9th Cir. 2019) (explaining that intergovernmental immunity is implicated when state laws "directly or indirectly affect[] the operation of a federal program or contract"); *United States v. Texas*, 566 F. Supp. 3d 605, 685–86 (W.D. Tex. 2021) ("[A] state law violates intergovernmental immunity if it interferes with a federal contractor's ability to discharge its contractual obligations to the federal government."); *GEO Group, Inc. v. City of Tacoma*, 2019 WL 5963112, at *5 (W.D. Wash. Nov. 13, 2019) ("The intergovernmental immunity doctrine … appl[ies] to federal contractors insofar as the challenged law regulates what the federal contractors have to do or how they do it pursuant to their contracts.").

## B.    The INA bars the injunctive relief the State requests.

Even setting the Supremacy Clause aside, a provision of the INA, 8 U.S.C. § 1252(f)(1), divests this Court of jurisdiction to enter the State's requested injunction.

Section 1252(f)(1) provides, in relevant part:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority *to enjoin or restrain the operation of the provisions* of part IV of this subchapter….

The Supreme Court explained in *Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022), that this provision "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out" the provisions of the INA that "charge the Federal Government with the implementation and enforcement of the immigration laws governing the inspection, apprehension, examination, and removal of aliens." *Id.* at 549–50 (citing 8 U.S.C. §§ 1221–1232).

Here, the State asks the Court to enjoin ICE "from releasing any detainee" from ICE's Richwood and Basile detention facilities without LDH's medical clearance. *See* Compl. ¶¶ 15–16. As already explained, that injunction would restrain ICE from "taking actions to enforce, implement, or otherwise carry out" provisions of the INA that govern the detention and removal of noncitizens. *See*

13

*Aleman Gonzalez*, 596 U.S. at 550. Accordingly, the Court lacks jurisdiction to enter the injunctive relief the State requests.

### C.    Counts 1 and 2 do not challenge final agency action.

The APA permits a federal court to review only agency actions "made reviewable by statute" or that are "final agency action for which there is no other adequate remedy in court." 5 U.S.C. § 704. An agency action is "final" under the APA if it (i) "mark[s] the consummation of the agency's decisionmaking process," and (ii) determines "rights or obligations" or creates "legal consequences." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016). The APA's finality requirement is "a jurisdictional prerequisite to judicial review." *Data Marketing Partnership, LP v. U.S. Dep't of Labor*, 45 F.4th 846, 853 (5thCir. 2022) (citation omitted).

Counts 1 and 2 challenge what the State describes as ICE's "stated intent to release detainees contrary to the Surgeon General's SHO Orders," arguing that such "intent" is final agency action under the APA. *See* Compl. ¶¶ 55–76 (citing 5 U.S.C. §§ 704, 706(2)(A), (B)). As an initial matter, it's not clear where that intent was ever stated. The only evidence the State seems to cite is the Louisiana Attorney General's description of a telephone call and an email between DHS and state officials, both allegedly occurring on October 15, 2024. *See* Decl. of Att'y Gen. Liz Murrill ¶¶ 12–18, ECF No. 21-2. But according to her own gloss of those communications, "the federal government representatives" merely "*refused to commit* to not release detainees before they have been medically cleared by [LDH]"; "stated that a detainee would still have to be 'medically cleared' by the facility staff before the release, but *could not agree* that no detainee would be released until also cleared by [LDH]"; and stated that ICE would "contact LDH and provide time to take appropriate action and coordinate any transfer of custody to LDH as needed" if the agency "encounter[ed] a situation involving a detainee that [it was] legally required to release." *Id.* ¶¶ 14–15, 18 (emphasis added). Nowhere, according to this evidence, did ICE state that it intended to release detainees "into Louisiana streets, bus stations, and airports"

14

without any medical clearance, as the State alleges. *See* Compl. ¶ 53. Instead, ICE told the State that it intends to work closely with LDH in the event ICE is legally obligated to release from its custody a detainee located at the Richwood or Basile facilities.

Amorphous challenges like this are precisely what the APA is designed to preclude. Indeed, it's hard to see how an agency's alleged "intentions" that a plaintiff infers from informal communications with agency personnel satisfy the statutory definition of "agency action." *See* 5 U.S.C. § 551 (defining "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act"). A contrary ruling would seemingly make every utterance from an agency employee susceptible to judicial review. *See, e.g., Walmart Inc. v. U.S. Dep't of Justice*, 21 F.4th 300, 308–11 (5th Cir. 2021) (rejecting "expansive" argument that an agency's stated positions or legal opinions "expressed behind closed doors" were "agency action").

Nor do ICE's communications with the State bear both markers of finality. According to the State's evidence, ICE simply explained to the State that, if ICE were legally obligated at some point in the future to release from its custody a detainee located at the Richwood or Basile facilities, it would medically clear that detainee and work closely with LDH to transfer custody. Setting aside whether such a statement can be considered the "consummation" of a decisionmaking process, *see La. State v. U.S. Army Corps of Engineers*, 834 F.3d 574, 581 (5th Cir. 2016) ("Agency action may mark the consummation of the agency's decisionmaking process … when the agency has asserted its final position on the factual circumstances underpinning the agency action." (cleaned up)), what ICE explained to the State did not *itself* determine any rights, impose any obligations, or cause any legal consequences that were not already extant, *see Luminant Generation Co., LLC v. EPA*, 757 F.3d 439, 442 (5th Cir. 2014) (finding no final agency action where the challenged action "*itself*" did not determine rights or obligations or create legal consequences).

### D. Count 3 does not state a justiciable § 706(1) claim.

In Count 3, the State challenges CDC's decision not to exercise its quarantine or isolation authorities under 42 C.F.R. § 70.6,[4] claiming that such action has been "unlawfully withheld" in violation of the APA. *See* Compl. ¶¶ 77–85 (quoting 5 U.S.C. § 706(1)). While the APA permits federal courts to compel agency action "unlawfully withheld," 5 U.S.C. § 706(1), judicial review of agency inaction is considerably constrained, *Anglers Conserv. Network v. Pritzker*, 809 F.3d 664, 670 (D.C. Cir. 2016). That's because the APA "carried forward" in § 706(1) the traditional practice of seeking judicial review through the common law writ of mandamus, *id.*; *accord Norton v. S. Utah Wilderness All.* (*SUWA*), 542 U.S. 55, 64 (2004)—a "drastic" remedy appropriate "only in extraordinary situations," *Kerr v. U.S. Dist. Ct. for N. Dist. of Cal.*, 426 U.S. 394, 402 (1976). Section 706(1) thus shares a common threshold with mandamus: A court may grant relief only where a plaintiff has shown "that an agency failed to take a *discrete* action that it is *required to take*." *SUWA*, 542 U.S. at 64; *see also Anglers*, 809 F.3d at 670 ("[Section] 706(1) grants judicial review only if a federal agency has a 'ministerial or non-discretionary' duty amounting to 'a specific, unequivocal command.'" (citing *SUWA*, 542 U.S. at 63–64)).

The State alleges nothing of the sort here—nor could it. By statute and regulation, CDC's decision whether to exercise its quarantine and isolation authorities is *discretionary* and thus not susceptible to judicial review under § 706(1). *See* 42 U.S.C. § 264(a) (providing that the "Surgeon General, with the approval of the Secretary, *is authorized* to make and enforce such regulations *as in his judgment are necessary*" (emphasis added)); 42 C.F.R. § 70.6 (providing that the "Director *may* authorize" the apprehension, medical examination, quarantine, isolation, or conditional release of any individual for the purpose of preventing the introduction, transmission, and spread of quarantinable

---

[4] State and local public health authorities play the principal role in implementing quarantine and isolation measures where necessary. Generally, the federal government's role in enforcing quarantine and isolation measures focuses primarily on preventing the spread of communicable disease (i) at U.S. ports of entry, 42 C.F.R. Part 71; and (ii) where state and local authority may be inadequate to prevent the communicable disease from spreading interstate, *id.* Part 70.

communicable diseases, as specified by Executive Order," under certain circumstances (emphasis added)); *see also, e.g., Flores v. Garland*, 72 F.4th 85, 89 (5th Cir 2023) ("The word 'may' customarily connotes discretion." (citation omitted)). Therefore, the State's § 706(1) claim is not justiciable.[5]

Additionally, the State asks this Court, in connection with its § 706(1) claim, to order CDC to "show cause" why the agency "should not issue an order pursuant to Title 42 of the U.S. Code, requiring the isolation and/or quarantine of detainees" at the Richwood and Basile facilities. *See* Compl. ¶ 6; Mot. 6. But that relief is unavailable for the same reasons, and requiring it would make little sense: Even if the Court were unsatisfied with CDC's response, it could not order mandamus-like relief directing the agency to exercise its discretionary authority in a particular way. The State points to no authority supporting issuance of a show-cause order in these circumstances, and the Court should decline the invitation.

### E.    The State's Tenth Amendment claim is meritless.

The State cannot succeed on its Tenth Amendment claim by simply invoking general maxims of federalism. *See* Compl. ¶¶ 55–66 (citing 5 U.S.C. § 706(2)). The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. The powers specifically delegated to Congress under Article I of the Constitution "are not powers that the Constitution 'reserved to the States.'" *United States v. Comstock*, 560 U.S. 126, 144 (2010); *accord New York v. United States*, 505 U.S. 144, 156 (1992) ("If a power is delegated to Congress in the Constitution, the Tenth

---

[5] For similar reasons, the APA precludes judicial review of the State's § 706(1) claim because the decision whether to authorize a quarantine or isolation is committed to CDC's discretion. *See* 42 U.S.C. 264(a) (authorizing the agency to authorized to "make and enforce such regulations *as in his judgment are necessary* to prevent the introduction, transmission, or spread of communicable diseases" (emphasis added)); 5 U.S.C. § 701(a)(2); *see also Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (explaining that an action is committed to agency discretion typically where a court has "no meaningful standard against which to judge the agency's exercise of its discretion" or the action "involves a complicated balancing of a number of factors which are peculiarly within its expertise" (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985))).

Amendment expressly disclaims any reservation of that power to the States ….”). So as long as federal action rests on a constitutionally delegated power, “there can be no violation of the Tenth Amendment.” *United States v. Mikhel,* 889 F.3d 1003, 1024 (9th Cir. 2018) (citation omitted); *accord United States v. DeCay*, 620 F.3d 534, 542 (5th Cir. 2010) (“When” the federal government “properly exercises its authority under an enumerated constitutional power, the Tenth Amendment is not implicated.”).

Here, the only federal action that the State contends would offend the Tenth Amendment would be if ICE released a detainee from the Richwood or Basile facilities pursuant to a federal judge’s or an Immigration Judge’s release order. But as explained, ICE would be required to take such action under the INA—a federal statute that is an evidence exercise of Congress’s power under the Constitution. *See Arizona v. United States*, 567 U.S. 387, 394–95 (2012). Where, as here, a federal statute is validly enacted under one of Congress’s enumerated powers, and the Executive Branch acts pursuant to that statute, the Tenth Amendment is no bar to federal action.

The State’s vague references to “foundational principles” and “historic police powers” cannot alter that conclusion. In addressing a Tenth Amendment claim, a court has “no license to employ freestanding conceptions of state sovereignty when measuring” federal authority under the Constitution. *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 550 (1985). Apart from a narrow anti-commandeering inquiry not relevant here, the only question under the Tenth Amendment is whether the federal government acts pursuant to one of its powers under the Constitution. *See, e.g., Kelley v. United States*, 69 F.3d 1503, 1509 (10th Cir. 1995); *Brackeen v. Haaland*, 994 F.3d 249, 299 (5th Cir. 2021) (en banc) (op. of Dennis, J.). If it does, a court “necessarily must also conclude that the [plaintiffs’] efforts to invoke abstract principles of federalism through the Tenth Amendment fail.” *Town of Johnston v. Fed. Hous. Fin. Agency*, 765 F.3d 80, 86 (1st Cir. 2014); *see also Garcia*, 469 U.S. at 549 (“States unquestionably do retain a significant measure of sovereign authority,” but “only to the extent

18

that the Constitution has not divested them of their original powers and transferred those powers to the Federal Government." (cleaned up)).

The State also suggests that a Tenth Amendment problem exists whenever federal action encroaches on an area typically regulated by the states. *See* Mot. 4. But "[t]here is no general 'doctrine implied in the Federal Constitution that the two governments, national and state, are each to exercise its powers so as not to interfere with the free and full exercise of the powers of the other.'" *Maryland v. Wirtz*, 392 U.S. 183, 195 (1968) (quoting *Case v. Bowles*, 327 U.S. 92, 101 (1946)). Indeed, it is axiomatic that the federal government does not "invade[] areas reserved to the States by the Tenth Amendment simply because it exercises *its* authority," even "in a manner that *displaces* the States' exercise of their police powers." *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 291 (1981) (emphasis added); *accord Brackeen*, 994 F.3d at 310 ("[T]he Federal Government, when acting within a delegated power, may override countervailing state interests, whether those interests are labeled traditional, fundamental, or otherwise." (cleaned up)).

Finally, as already explained, the State's argument that it possesses the authority to regulate ICE's operations at the Richwood and Basile facilities ignores the principle of intergovernmental immunity. *Supra* 9–13.

### F.      The State's arbitrary-and-capricious claim is meritless.

The State claims ICE has acted arbitrarily and capriciously in violation of the APA, *see* Compl. ¶¶ 67–76, but its arguments on this score are unpersuasive. Judicial review under the APA's arbitrary-and-capricious standard is highly "deferential," requiring only "that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project (Prometheus)*, 141 S. Ct. 1150, 1158 (2021). A court must presume the agency acted validly, *Tex. Tech Phys. Assocs. v. HHS*, 917 F.3d 837, 844 (5th Cir. 2019), "may not substitute its own policy judgment for that of the agency," *Prometheus*, 141 S. Ct. at 1158, and "should uphold a decision of less than ideal clarity if the agency's path" is reasonably

discernible, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009) (citations omitted).

*First*, the State claims it would "make zero sense" for ICE to "release[] into the public" detainees "who have not been medically cleared." *See* Mot. 5–6. ICE agrees. That is why, according to the State's own evidence, ICE told the State that "a detainee would … have to be '*medically cleared*' by the facility staff before" being released, and that ICE would "contact LDH and provide time to take appropriate action and coordinate any transfer of custody to LDH as needed" if the agency "encounter[ed] a situation involving a detainee that [it was] legally required to release." *See* CITE ¶¶ 14–15, 18 (emphasis added).

*Second*, the State asserts that it "makes zero sense to move a currently quarantined" or "isolated detainee" from one setting to "an identical setting elsewhere." *See* Mot. 6. But this argument is so vague that it prevents the Federal Defendants from providing a substantive response.

## II.    The State has not shown it will suffer irreparable harm absent preliminary relief.

Merits aside, the State has failed to show that it is likely to suffer imminent, irreparable harm—an "'indispensable' requirement for a preliminary injunction." *See Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 391 (6th Cir. 2020) (citation omitted). "To constitute irreparable harm, an injury must be certain, great, actual and not theoretical," *Duarte v. City of Lewisville*, 136 F. Supp. 3d 752, 791 (E.D. Tex. 2015) (citation omitted), and must be "so imminent that there is a clear and present need for equitable relief to prevent" it, *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (citation omitted); *accord Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975). A plaintiff cannot make this showing with "unsubstantiated and conclusory assertions," *John Doe Co. v. CFPB*, 849 F.3d 1129, 1134 (D.C. Cir. 2017), but must substantiate any claim of irreparable injury with "independent proof, or no injunction may issue," *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989).

In support of its motion, the State alleges only one harm: that because ICE intends to "release non-medically cleared detainees into the public," that "portend[s]" "the potential of loss of life" from

20

the spread of TB. *See* Mot. at 6–7. But as already explained, that allegation is false. Contrary to what

the State says, ICE does *not* intend to release detainees into the public without medical clearance. *See*

*See* Murrill Dec;. ¶¶ 14–15, 18. Nor is there *any* evidence that there is even a remote risk of a spread

of TB. The State's only claim of harm is thus, at best, abstract and utterly speculative. *See Holland Am.*

*Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985) ("Speculative injury is not sufficient" to

"make a clear showing of irreparable harm.").

**III.    A preliminary injunction would disserve the public interest.**

When the government is the opposing party, the third and fourth equitable factors—the

balance of harms and the public interest—"merge," *Nken v. Holder*, 556 U.S. 418, 435 (2009), in

recognition that "the government's interest *is* the public interest," *United States v. Texas*, 566 F. Supp.

3d 605, 690 (W.D. Tex. 2021) (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir.

2016)). A preliminary injunction here would undermine several critical public interests.

*First*, enjoining ICE from removing, releasing, or transferring detainees from the Richwood

and Basile facilities would interfere with ICE's enforcement of the Nation's immigration laws. *See*

*Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("Any time [the Government]

is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a

form of irreparable injury." (alteration adopted) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox*

*Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers))); *cf. Trump v. Thompson*, 20 F.4th 10, 48

(D.C. Cir. 2021) ("[C]ourts must take care not to unnecessarily 'halt the functions of a coordinate

branch.'" (quoting *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 511 n.17 (1975))). As explained, ICE

is required by law to release noncitizens in certain circumstances, including when they are granted

relief by an immigration judge; when they are ordered released by a federal judge, like in habeas

proceedings; and when they post bond. Enjoining ICE from releasing noncitizens in any of those

instances would prevent it from complying with its statutory mandate. *See Jacksonville Port Auth. v.*

21

*Adams*, 556 F.2d 52, 58–59 (D.C. Cir. 1977) ("[There is] an overriding public interest . . . in the general importance of an agency's faithful adherence to its statutory mandate.").

For example, since this Court's TRO, ICE has been prohibited (absent approval from the Court) from releasing 130 noncitizens detained at the Richwood and Basile facilities who were granted parole. *See* Ladwig Decl. 12. During that same period, ICE also had to cancel (absent approval) 146 noncitizen removals from these facilities. *Id.* There are, moreover, 92 "high level" detainees at the Basile facility that are cleared to travel internationally so they can be removed from the country. *See id.* ¶ 20. But as long as ICE is enjoined from releasing detainees from this facility, none of the 92 "high level" detainees will be removed, despite having had no contact with the Index Patient and all testing negative for TB. *Id.*

*Second*, and relatedly, enjoining ICE from releasing detainees from the Richwood and Basile facilities will continue to have adverse impacts on detainees at those locations without any apparent justification. For example, since this Court's TRO, ICE has been unable (absent approval) to reunify a noncitizen family where the mother, who has not been diagnosed with TB, is eligible for release to join her husband and child. *Id.* ¶ 6. ICE has been prohibited (absent approval) from taking detainees to the hospital or other medical facilities to address certain medical needs, consistent with its obligations to provide all detained noncitizens timely and adequate medical care. *Id.* ¶ 14–15.[6]

## CONCLUSION

For the foregoing reasons, the Court should deny the State's motion for preliminary relief.

---

[6] At a minimum, any preliminary injunction this Court enters should "be no more burdensome" to the Federal Defendants "than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). Even if the Court were to credit the State's concerns, the relief the State requests is ill-fitting by any standard. To provide only one example, there is no apparent justification for restraining ICE's operations at the Richwood facility, where no detainee has had contact with the Index Patient for *over thirteen weeks*— well in excess of the eight-to-ten-week incubation period—and no other case of active TB has been identified.

Dated: October 25, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRANDON B. BROWN
United States Attorney

BRIGHAM J. BOWEN
Assistant Branch Director

/s/ Jody D. Lowenstein
JODY D. LOWENSTEIN
Mont. Bar No. 55816869
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 598-9280
Email: jody.d.lowenstein@usdoj.gov

s/ Shannon T. Smitherman
Shannon T. Smitherman (#32366)
Assistant United States Attorney
300 Fannin Street, Suite 3201
Shreveport, Louisiana 71101-3068
Telephone: (318) 676-3613
Fax: (318) 676-3642
Email: shannon.smitherman@usdoj.gov

s/ Kristen H. Bayard
KRISTEN H. BAYARD (#32499)
Assistant United States Attorney
800 Lafayette Street, Suite 2200
Lafayette, Louisiana 70501
Telephone: (337) 262-6618
Facsimile: (337) 262-6693
Email:   kristen.bayard@usdoj.gov

*Attorneys for the Federal Defendants*

23

**CERTIFICATE OF SERVICE**

On October 25, 2024, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Western District of Louisiana, using the Court's electronic case filing system. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ Jody D. Lowenstein
JODY D. LOWENSTEIN
Trial Attorney
U.S. Department of Justice